Slip Op. 13-88

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| LATITUDES INTERNATIONAL FRAGRANCE, INC., A CALIFORNIA CORPORATION D/B/A MAESA HOME, | |
| Plaintiff, | Before: Leo M. Gordon, Judge |
| v. | Court No. 11-00010 |
| UNITED STATES, | |
| Defendant. | |

**OPINION**

[Judgment for Plaintiff.]

Dated:  July 17, 2013

    <u>Michael K. Grace</u>, Grace & Grace, LLP of Los Angeles, CA argued for Plaintiff Latitudes International Fragrance, Inc.

    <u>Edward F. Kenny</u>, Civil Division, U.S. Department of Justice, of New York, NY, argued for Defendant United States.  With him on brief were <u>Tony West</u>, Assistant Attorney General and <u>Barbara S. Williams</u>, Attorney in Charge of International Trade Field Office.  Of counsel was Beth Brotman, Office of Chief Counsel, U.S. Customs and Border Protection of Washington, DC.

    Gordon, Judge:   This opinion follows a bench trial.   Plaintiff, Latitudes International Fragrance, Inc., a California Corporation d/b/a Maesa Home ("Latitudes"), challenges the decision of Defendant U.S. Customs and Border Protection ("Customs") denying Latitudes' protest of Customs' classification of the imported merchandise, described as "Bottle glass wavy RCL Machine blown diffuser bottle" ("subject merchandise," "diffuser bottles," or "bottles") within the Harmonized Tariff Schedule of the United States ("HTSUS").   Customs classified the subject merchandise as

"[g]lassware of a kind used for table, kitchen, toilet, office, indoor decoration or similar purposes (other than that of heading 7010 or 7018): Other glassware: Other: Other: Other: Valued over $0.30 but not over $3 each" with a 30 percent ad valorem duty rate under HTSUS subheading 7013.99.50.   Plaintiff claims that the diffuser bottles are properly classified as "bottles . . . and other containers, of glass, of a kind used for the conveyance or packing of goods; preserving bottles of glass; stoppers, lids and other closures, of glass . . . [o]ther containers (with or without their closures)" duty free under HTSUS subheading 7010.90.50.   The court has jurisdiction pursuant to 28 U.S.C. § 1581(a) (2006).   For the reasons set forth below, the subject merchandise is properly classifiable under HTSUS subheading 7010.90.50, and the court will enter judgment for Plaintiff.

## I. Background

Each diffuser bottle measures approximately 9.67 centimeters in height by 6.96 centimeters in diameter, and has a decal logo measuring ¾ inches in diameter.  See Figure 1.   The subject merchandise was imported and sold to Plaintiff empty.   The bottles, in their imported condition, were not marketed or sold by Plaintiff to retailers or customers, and did not include any stoppers, diffuser reeds, or diffuser oils.   Latitudes assembled in the United States diffuser kits ("finished product"), which included the subject merchandise filled with fragranced diffuser oil, a stopper inserted in the bottle's top affixed with shrink wrapped plastic, diffuser reeds, instructions, and the retail packaging.  See Figure 2.   Plaintiff's customers are retailers who market the finished product to consumers as a "scented diffuser" for resale under retailers' private label

brands.  Target is a retailer, who purchased Plaintiff's finished product branded under the "Smith & Hawken" private label.  The cost of the imported merchandise was a small percentage of the cost of the finished product.  The suggested retail price for the finished product at Target was approximately $18.00.  See Pretrial Order, Schedule C ("Uncontested Facts"), Mar. 21, 2013, ECF No. 32.

The ultimate consumer of the finished product is one who wishes to fragrance an enclosed space with a scented diffuser.  The ultimate consumer uses the finished product by removing the bottle from the carton, unwrapping the plastic seal around the neck of the bottle, removing the stopper, and inserting the diffuser reeds into the mouth of the bottle, which allows the fragranced oil to be drawn up through the reeds and the scent to be diffused.  The bottle is designed to allow the fragranced oil to be diffused for a period of 60 to 90 days, depending on the airflow in the area where the bottle is located.  Plaintiff does not sell oil refills or replacement diffuser reeds for its finished scented diffuser product.  Id.




Figure 1 (Pl.'s Ex. 2; Def.'s Ex. C)          Figure 2 (Pl.'s Ex. 14)

Customs liquidated the entries of the subject merchandise under HTSUS subheading 7013.99.50 as glassware for indoor decoration.  Latitudes claimed that the

diffuser bottles were classifiable under HTSUS subheading 7010.90.50 as bottles for

the conveyance of oils.  Latitudes filed a timely protest, Pl.'s Ex. 12 & Def.'s Ex. A, and

an application for further review challenging Customs' classification, Def. Ex. B.

Customs determined that the imported diffuser bottles were properly classified as an

article of glassware used for table, kitchen, toilet, office, indoor decoration or similar

purposes under HTSUS heading 7013.  See HQ H097637 (Sept. 20, 2010), Pl.'s Ex. 14

& Def.'s Ex. H.  Customs reasoned that glassware used for the conveyance or packing

of goods covered by heading 7010 are "jars designed to remain closed as they transport

liquids or solids from one location to another."  HQ H097637 at 5.  To the contrary,

Customs explained that glassware for indoor decoration under heading 7013 is

"designed to be displayed in the home or office as they hold material inside of them"

and "may remain open as they display their contents and are meant to lend decoration

to the items they display."  Id.  In deciding to classify the imported merchandise under

heading 7013, Customs also relied on a series of prior ruling letters covering similar

merchandise.  Id.

## II. Standard of Review

The court reviews Customs' protest decisions de novo.  28 U.S.C. § 2640(a)(1)

(2006).  A classification decision involves two steps.  The first step addresses the

proper meaning of the relevant tariff provisions, which is a question of law.  The second

step involves determining whether the merchandise at issue falls within a particular tariff

provision as construed, which when disputed, is a question of fact.  See Faus Group,

Inc. v. United States, 581 F.3d 1369, 1371-72 (Fed. Cir. 2009) (citing Orlando Food Corp. v. United States, 140 F.3d 1437, 1439 (Fed. Cir. 1998)).

While the court accords deference to Customs' classification decisions relative to their "power to persuade," United States v. Mead Corp., 533 U.S. 218, 235 (2001) (citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944) ("Skidmore")), the court has "an independent responsibility to decide the legal issue of the proper meaning and scope of the HTSUS terms." Warner-Lambert Co. v. United States, 407 F.3d 1207, 1209 (Fed. Cir. 2005) (citing Rocknel Fastener, Inc. v. United States, 267 F.3d 1354, 1358 (Fed. Cir. 2001)).

Customs enjoys a statutory presumption of correctness as to the factual components of its classification decision. See 28 U.S.C. § 2639(a)(1) (2006). To overcome that presumption, an importer must produce evidence that demonstrates by a preponderance of the evidence that the factual basis of Customs' classification decision is incorrect. See Universal Elecs. v. United States, 112 F.3d 488, 492 (Fed. Cir. 1997).

## III. Discussion

Classification disputes under the HTSUS are resolved by reference to the General Rules of Interpretation ("GRIs") and the Additional U.S. Rules of Interpretation ("ARIs"). See Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1379 (Fed. Cir. 1999). The GRIs are applied in numerical order. Id. Interpretation of the HTSUS begins with the language of the tariff headings, subheadings, their section or chapter notes. Id. Pursuant to GRI 1, merchandise that is described "in whole by a single classification

heading or subheading" is classifiable under that heading.  CamelBak Prods., LLC v. United States, 649 F.3d 1361, 1364 (Fed. Cir. 2011).

The court construes tariff terms according to their common and commercial meanings, and may rely on both its own understanding of the term as well as upon lexicographic and scientific authorities.  See Len-Ron Mfg. Co. v. United States, 334 F.3d 1304, 1309 (Fed. Cir. 2003).  The court may also refer to the World Customs Organization's Harmonized Description and Coding System's Explanatory Notes ("Explanatory Notes" or "ENs") "accompanying a tariff subheading, which—although not controlling—provide  interpretive guidance." E.T. Horn Co. v. United States, 367 F.3d 1326, 1329 (Fed. Cir. 2004) (citing Len-Ron, 334 F.3d at 1309).  In making its determination, the court must decide "whether the government's classification is correct, both independently and in comparison to the importer's alternative [proposed classification]."  See Jarvis Clark Co. v. United States, 733 F.2d 873, 878 (Fed. Cir. 1984).

The parties agree that headings 7010 and 7013, HTSUS, are "principal use" provisions.  Principal use provisions are governed by ARI 1(a).  See Group Italglass U.S.A., Inc. v. United States, 17 CIT 1177, 839 F. Supp. 866 (1993); Dependable Packing Solutions, Inc. v. United States, 37 CIT ___, ___, Slip Op. 13-23 (Feb. 20, 2013) (citing Automatic Plastic Molding, Inc. v. United States, 26 CIT 1201, 1205 (2002)).  ARI 1(a) states:

> [i]n the absence of special language or context which
> otherwise requires .  .  .  a tariff classification controlled by
> use (other than actual use) is to be determined in
> accordance with the use in the United States at, or

> immediately prior to, the date of importation of goods of that
> class or kind to which the imported goods belong, and the
> controlling use is the principal use.

Accordingly, when classifying goods pursuant to principal use, it is the use of the class or kind of merchandise to which the imported merchandise belongs, rather than the use of the article itself, which is decisive. BenQ Am. Corp. v. United States, 646 F.3d 1371 (Fed. Cir. 2011). And, principal use is that use "'which exceeds any other use.'" Aromont USA Inc. v. United States, 671 F.3d 1310, 1312 (Fed. Cir. 2012) (quoting Lenox Collections v. United States, 20 CIT 194, 196 (1996)) (internal citation omitted).

ARI 1(a) calls for "a determination as to the group of goods that  are commercially fungible with the imported goods." Primal Lite, Inc. v. United States, 182 F.3d 1362, 1365 (Fed. Cir. 1999). "The so-called Carborundum factors provide guidance in determining what goods are commercially fungible with the imported goods." Aromont USA, 671 F.3d at 1312-13. These factors are (1) the general physical characteristics of the merchandise; (2) the expectation of the ultimate purchasers; (3) the channels of trade in which the merchandise moves; (4) the environment of the sale of the merchandise, such as accompanying accessories and the manner in which the merchandise is advertised and displayed; (5) the use of the goods at issue, if any, in the same manner as merchandise which defines the class; (6) the economic practicality of so using the import; and (7) the recognition in the trade of this use ("the Carborundum factors"). See United States v. Carborundum Co., 63 CCPA 98, 102, 536 F.2d 373, 377 (1976).

Plaintiff maintains that the principal use of the diffuser bottles is to convey the fragranced oil to the ultimate consumer, and thus the bottles are classifiable under heading 7010. Plaintiff contends that consumers purchase the scented diffuser product for the fragranced oil contained in the bottle, not for the bottle that conveys the diffuser oil. Plaintiff further claims that the bottle and diffuser reeds are intended to be discarded by the consumer after the fragranced diffuser oil evaporates, and that the imported merchandise and the finished product are neither intended nor marketed for reuse by the consumer. Lastly, Plaintiff claims that the imported merchandise and finished product are not marketed to consumers for storage purposes. Defendant, on the other hand, contends that the diffuser bottle does more than convey oil to a place. Rather, it argues that the bottle's pleasing design and principal use as an attractive ("decorative") means to fragrance a space in a home or office for extended periods of time make the bottle similar to a vase, and therefore, classifiable under heading 7013.

This case depends upon whether the Carborundum factors indicate that the diffuser bottles are of the class or kind of goods principally used to commercially convey oils, or of the class or kind whose principal use is as indoor decoration. If the factors demonstrate that the subject merchandise is used to carry or transport fragranced oil from one place to another or to serve as a channel or medium to cause the fragranced oil to pass from one place to another, then that would indicate a finding that the diffuser bottles are glassware used commercially for the conveyance of goods. See Webster's Third New International Dictionary of the English Language Unabridged 499 (1986). On the other hand, if these factors show that the subject merchandise is "decorative," i.e.,

used to adorn, beautify, or enhance the attractiveness of something, then that would indicate the diffuser bottles are of a class or kind of glassware principally used as indoor decoration.  Id. at 587.

There are no relevant section or chapter notes for either heading, but the Explanatory Notes aid in understanding the scope of the two respective headings. Heading 7010, HTSUS, encompasses types of glass used commercially for the conveyance or packing of goods, whereas heading 7013 includes glassware used for a table, kitchen, toilet, office, indoor decoration or similar purposes, other than glassware within the scope of heading 7010 or 7013.  The ENs for heading 7010 indicate that it includes bottles (including siphon vases) and similar containers, of all shapes and sizes, used as containers for, among other things, oils, and perfumery preparations, are made of ordinary glass, colored or colorless, and are generally designed for some type of closure, which may take the form of ordinary stoppers (of cork, glass, etc.), or special devices.  See Explanatory Notes, 70.10(A) (2007).[1]  The ENs also state that these containers remain in this heading even if they are decorated.  Id.

The Explanatory Notes for heading 7013 indicate that it covers items including "**[g]lassware for indoor decoration** . . . such as vases, ornamental fruit bowls, statuettes, fancy articles (animals, flowers, foliage, fruit, etc.), table-centres (**other than those of heading 70.09**), aquaria, incense burners, etc., and souvenirs bearing views." Id. at 70.13(4) (emphasis in original).  Glassware under heading 7013 may consist of ordinary glass that is cut, frosted, etched or engraved, or otherwise decorated.  Id. at

---

[1] Further citations to the ENs are to the relevant provisions of the 2007 edition, which were in effect at the time of the importation of the subject merchandise.

70.13.  Finally, the ENs for both heading contain reciprocal language indicating that heading 7010 excludes containers under heading 7013, but does include containers used primarily for the commercial conveyance of goods.  Id. at 70.10(c), 70.13(b).

A.  **Carborundum** Factors

1.  General Physical Characteristics of the Merchandise

The first Carborundum factor looks to the general physical characteristics of the merchandise.  The bottles are approximately 9.67 centimeters in height and 6.96 centimeters in diameter, and have a decal logo that is ¾ inches in diameter. Uncontested Facts ¶ 1; Tr. 70:14-16 (Cashman Direct for Pl.).  The bottles are described as wavy, Tr. 28:6-20 (Klein Direct for Pl.); 81:6-11 (Cashman Direct for Pl.), with a pebbly finish, Tr. 141:12-15 (Cashman Direct for Def.).  They are designed with a wide base and short narrow neck with an opening at the top to take a stopper. Tr. 142:10-15 (Cashman Direct for Def.).  The stopper is intended to prevent the fragranced oil from leaking out of the diffuser bottle prior to the actual use of the diffuser kit.  Tr. 86:10-88:6 (Cashman Direct for Pl.).  The narrow concave beveled neck and wide base allow the ultimate consumer to spread out diffuser reeds at the top of the bottle to permit the fragranced oil to be disbursed in a home or office for 60-90 days. Tr. 38:17-19 (Klein Direct for Pl.); 74:11-21 (Cashman Direct for Pl.).  While the diffuser bottles have a pleasing design, that design is not unique to Latitudes.  Tr. 84:10-23 (Cashman Direct for Pl.); 155:16-25 (Cashman Direct for Def.).

For Defendant this pleasing design is key to what makes these imported diffuser bottles decorative glassware.  Defendant argues that the bottles are similar to the vases

found classifiable under heading 7013 in Dependable Packaging.  Plaintiff concedes the

subject merchandise has a pleasing design, Tr. 84:10-23 (Cashman Direct for Pl.), and

has a logo, Uncontested Facts ¶ 1.  However, these facts alone do not require a finding

that the bottles are decorative due to their physical characteristics.  See ENs, 70.10(A)

(glassware remains in heading even if decorated).

Where an article is designed with a finish capable of closure, that fact is

"probative as to . . . [the article's] principal use as a container for the conveyance or

packing of goods.'"  Dependable Packaging, 37 CIT at ___, Slip Op. 13-23 at 9 (citing

Accurate Plastic Moulding, Inc. v. United States, 26 CIT 1201, 1204 n.3).  Here, the

uncontroverted testimony of George Cashman, Plaintiff's former Chief Financial Officer,

along with a physical examination of the finished product demonstrate that the diffuser

bottles were designed to take a stopper, which prevents the fragranced oil from leaking

out of the bottles.  The capacity of the bottles to take a stopper is a physical

characteristic that distinguishes glassware for the conveyance of goods under heading

7010 from decorative glassware under heading 7013.  See ENs, 70.10(A) (heading

7010 includes bottles generally designed for some type of closure that take the form of

an ordinary stopper).  It is also the physical characteristic that distinguishes the diffuser

bottles from the vases in Dependable Packaging.  Accordingly, after considering the

physical characteristics of the imported bottles the court finds that they are more

appropriately in a class or kind of glassware for the conveyance or packing of

fragranced oil.

2.  Expectations of the Ultimate Purchaser

The second factor is the expectations of the ultimate purchaser.  The parties agree that Plaintiff imports the bottles empty and does not sell them in their imported condition to retailers or the ultimate consumer.  Uncontested Facts ¶¶ 2 & 3.  They also agree that the ultimate consumer purchases the finished product, i.e., the diffuser kit, Uncontested Fact ¶ 6, and that the bottles have a pleasing design, Tr. 84:10-23 (Cashman Direct for Pl.).  However, Plaintiff contends that the ultimate consumer buys the bottles, as part of the diffuser kits, to consume the fragranced oil, while Defendant maintains that the consumer displays the bottles as a safe and attractive way to fragrance a space in a home or office for an extended period of time.  Additionally, the parties differ over whether the bottles are intended to be discarded after initial use or to be reused with refill kits.

Unfortunately, neither party proffered evidence in the form of consumer or industry studies, or expert reports that provide a basis for the court to determine the expectations of the ultimate consumer.  George Cashman, as Plaintiff's USCIT Rule 30(b)(6) witness, testified that the ultimate consumer expects to use the diffuser bottles in combination with the fragranced oil and diffuser reeds to fragrance an area in a home or office.  Tr. 81:21-83:4 (Cashman Direct for Pl.).  Mr. Cashman also testified that Latitudes does not produce or market refill kits.  Tr. 76:11-77:5 (Cashman Direct for Pl.). Jeffrey Klein, the Chief Financial Officer of Plaintiff's corporate parent, Maesa LLC, and Mr. Cashman's supervisor, testified, in his lay capacity, that he discards the subject merchandise once the fragranced oil evaporates.  Tr. 38:12-16 (Klein direct for Pl.).

Lauren Juszak, a buyer of home fragrance, candles, and home décor for Bed, Bath &

Beyond, testified for Defendant regarding the existence of reed diffuser refill kits in the

marketplace at the time of the subject importation.  Tr. 132:2-18 (Juszak Direct for Def.).

From Ms. Juszak's testimony, Defendant wishes the court to infer that the existence of

refill kits in the marketplace means that the ultimate consumer expects to use diffuser

bottles as indoor decoration.  The credible testimony of Messrs. Cashman and Klein,

taken separately or together, are not sufficiently indicative of whether the expectations

of the ultimate purchaser are to discard diffuser bottles after the fragranced oil

evaporates.  Similarly, the credible testimony of Ms. Juszak provides an insufficient

basis for the court to determine that the expectations of the ultimate consumer are that

diffuser bottles are used as an indoor decoration.  In sum, the testimony of these

witnesses alone is not probative of the expectations of the ultimate purchaser.

The retail value of the finished product is, however, probative of those

expectations.  The record contains evidence that the value of the bottle is small

compared to the overall price of the finished product.  Uncontested Facts ¶ 12.  That

value ($.30-.50), Tr. 85:19-22 (Cashman Direct for Pl.), is incidental to the retail price

($18), Uncontested Facts ¶ 11, of the diffuser kit.  It is the fragranced oil that makes a

difference in Latitudes' pricing of diffuser kits.  Tr. 154:12-155:5; 162:10-14 (Cashman

Direct for Def.).  Taken together, these facts suggest that the ultimate purchaser pays a

de minimis price to obtain the diffuser bottles in connection with the fragranced oil.

Based on the value of the subject merchandise, as compared to the value of the

fragranced oil, there is no evidence in the record that would indicate that the

merchandise and not the fragranced oil was the item being offered for sale.  Therefore,

the retail price of the finished product in conjunction with the testimony of Messrs.

Cashman and Klein demonstrate that the ultimate consumer expects to purchase the

bottles, as part of the finished product; to consume the fragranced oil; discard the

bottles after the oil evaporates; and not display the bottles as an indoor decoration.

### 3.   Channels of Trade in Which the Merchandise Moves

The third factor examined by the court is the channels of trade in which the

merchandise moves.  It is undisputed that the diffuser bottles are imported empty,

Uncontested Facts ¶ 2, and are not sold to the ultimate retailer or purchaser as

imported, Uncontested Facts ¶ 3.  The diffuser bottles are first combined with diffuser

reeds and fragranced oil, and then assembled and packaged as diffuser kits before

being sold to the retailer, Tr. 73:16-74:3 (Cashman Direct for Pl.), and in turn, to the

ultimate purchaser, Uncontested Fact ¶ 6.  These circumstances differ from those in

Dependable Packaging, where the court found an imported vase decorative and not

glassware used for the conveyance or packing of goods because the vase was sold

either with or without flowers.  Dependable Packaging, 37 CIT at ___, Slip Op. 13-23 at

13.   Here, Plaintiff's diffuser bottles are only sold as part of the finished product.

Tr. 86:2-7 (Cashman Direct for Pl.).  The merchandise was not sold empty at the retail

level, nor were they ever marketed or sold directly to the ultimate consumer unless filled

with fragranced oil and as part of the finished product.  Uncontested Facts ¶ 3.  Again,

Defendant seeks to have the court infer from the testimony of Ms. Juszak, regarding the

existence of refill kits in the marketplace, that the bottles are capable of reuse and thus

are decorative glassware.  The court is unwilling to draw that inference.  To the contrary, the court believes that the weight of the evidence demonstrates that the imported merchandise moves in channels of trade of glassware whose principal use is for the conveyance of oils.

### 4.  Environment of Sale

The fourth factor examined by the court is the environment in which the merchandise is advertised and sold.  As noted previously, Plaintiff's diffuser bottles are combined with fragranced oil and diffuser reeds, which are then packaged and sold in their totality as a diffuser kit.  Tr. 73:16-74:3 (Cashman Direct for Pl.).  The bottles are not sold, advertised, or displayed separately by Latitudes' retail customers, such as Target.  Uncontested Facts ¶¶ 6 & 7.  Once again, Plaintiff's diffuser bottles are unlike the vases in Dependable Packaging, which were displayed packed with flowers, "encouraging the retail customer to purchase the flowers and the vase for their combined decorative value"  and appeared in an advertising brochure "in a separate 'floral' section, depicting both packed and unpacked vases."  Dependable Packaging, 37 CIT at ___, Slip Op. 13-23 at 14.  Here the record shows that the packaging and labeling of the diffuser kits emphasize the fragranced oil, which provides an aromatic scent to an area in a home or office, and not the diffuser bottle.  Tr. 39:9-16 (Klein Direct for Pl.).  While the diffuser bottles are aesthetically pleasing, that aesthetic value is incidental to its principal use – the conveyance of the fragranced oil.

5.   Use in the Same Manner as Merchandise Which Defines the Class

The fifth factor is the usage of the merchandise which defines the class.   It is undisputed that the bottles are not sold empty to retailers or to the ultimate purchaser, Uncontested Facts ¶¶ 2 & 3.   The imported bottles are combined with the diffuser reeds and the fragranced oil, Tr. 73:16-74:3 (Cashman Direct for Pl.), to provide an aromatic scent in an area in a home or office for an extended period of time, Tr. 82:17-83:4 (Cashman Direct for Pl.); 38:17-19 (Klein direct for Pl.).   There is some evidence of the existence of refill kits in the marketplace, Tr. 132:2-12 (Juszak Direct for Def.); 162:20-172:9 (Cashman Direct for Def.), thereby suggesting that diffuser bottles are reusable, Tr. 168:19-169:22 (Cashman Direct for Def.).   While this evidence demonstrates that the subject merchandise <u>may be used</u> as indoor decoration, that evidence is not sufficiently probative to show that the decorative use of the merchandise is its principal use, namely the use "which exceeds any other use."   <u>Aromont</u>, 671 F.3d at 1312 (internal quotation omitted).   Additionally, there was no evidence, in the form of industry studies or customer surveys, or testimony offered by Defendant demonstrating that the decorative use of diffuser bottles exceeded any other use of the bottles.   Therefore, the court finds that this factor indicates that the principal use of the subject merchandise is for the conveyance of fragranced oils.

6.   Economic Practicality of So Using the Imported Merchandise

The next factor is the economic practicality of using the imported merchandise. As indicated above, the value of the bottle is a small percentage of the overall price of the finished product.   Uncontested Facts ¶ 12.   That value ($.30-.50), Tr. 85:19-22

(Cashman Direct for Pl.), is incidental to the retail price ($18), Uncontested Facts ¶ 11, of the diffuser kit.   Mr. Cashman testified that Latitudes chose the subject diffuser bottles based on customer preference, Tr. 72:21-73:9 (Cashman Direct for Pl.), and a low price point, Tr. 71:20-72:10 (Cashman Direct for Pl.), because the fragranced oil is the costly component of the finished product, Tr. 154:12-155:5; 162:10-14 (Cashman Direct for Def.).  He also testified that the low price point for diffuser bottles was a driver for Latitudes' customers.   Tr. 145:19-146:9 (Cashman Direct for Def.).   Mr. Cashman further stated that it does not make economic sense to reuse the bottles by purchasing oil refills and replacement diffuser reeds because the cost of the bottles is so low. Tr. 78:9-79:10 (Cashman Direct for Pl.).   Defendant offered no evidence regarding the economic practicality of using the diffuser bottles in the same manner as other decorative glassware in a home or office.   Additionally, it did not provide evidence of selling diffuser bottles empty at the retail level.   The absence of this type of evidence distinguishes the subject merchandise from the vases in Dependable Packaging.  See Dependable Packaging, 37 CIT at ___, Slip Op. 13-23 at 15-16.  Accordingly, this factor supports the classification of the diffuser bottles as glassware under HTSUS heading 7010.

## 7.  Recognition in the Trade of this Use

The final element of the Carborundum factors is the recognition of this use in the trade.   The competing evidence on this factor is not very probative.   Mr. Cashman states that the diffuser bottle is designed for single use and that Latitudes does not sell refills for their diffuser kits.   Tr. 78:9-79:3 (Cashman Direct for Pl.).   He acknowledges,

however, that other private labels sell refills for the diffuser kits, encourage reusing

diffuser bottles, Tr. 162:20-173:3 (Cashman Direct for Def.), and even sell diffuser

bottles separately, rather than as a part of a diffuser kit, Tr. 150:14-23 (Cashman Dir. for

Def.).   Additionally, there is testimony from Ms. Juszak regarding refill kits in the

marketplace.   Tr. 132:2-18 (Juszak Direct for Def.).   Encouraging their reuse and the

existence of some refill kits in the marketplace does not equate to diffuser bottles being

principally used as an indoor decoration.   Equally, the record is devoid of industry

studies or consumer surveys reflecting that the principal use of the merchandise is to

convey fragranced oils.

### B.  Examination of the Diffuser Bottle

The imported merchandise is "often a potent witness in classification cases."

Simod Am. Corp. v. United States, 872 F.2d 1572, 1578 (Fed. Cir. 1989).   After

examining samples submitted by the parties, Pl.s Ex. 2 & Def.'s Ex. C (Figure 1); Pl.'s

Ex. 15 (Figure 2), the court finds that the diffuser bottles fit the description in the ENs for

glassware included within heading 7010, namely that they were made of ordinary glass,

were designed for some type of closure, and were used as a container to convey oils.

### C.  Headquarters Ruling Letter H097637

Defendant argues that HQ H097637 ("Ruling Letter") is entitled to Skidmore

deference because it is thorough and persuasive.   The court disagrees.   In classifying

the subject merchandise, Customs analyzed whether the subject merchandise was

glassware for the conveyance or packing of goods within the meaning of heading 7010

or glassware for indoor decoration under heading 7013.   In considering heading 7010,

Customs focused on whether the subject merchandise was a jar and was imported with lids or caps. The latter was significant in distinguishing glassware that was designed to remain closed in transporting its contents from one place to another (heading 7010) from glassware that remained open as it displayed its contents and lent decoration to those contents (heading 7013). See Ruling Letter at 5. For Customs, because the subject merchandise did not meet the characteristics of a jar for purposes of heading 7010, it was classifiable as indoor decoration under heading 7013.

The problem with this analysis is that Customs fails to address Plaintiff's claim that the subject merchandise is a bottle - not a jar - whose principal use is the conveyance or packing of fragranced oils. Additionally, it appears that, despite focusing on jars, Customs ignored the relevant ENs, which describe jars principally used for the conveyance or packing of "certain foodstuffs, . . . cosmetic or toilet preparations, . . . pharmaceutical products, polishes, cleaning preparations, etc." See ENs, 70.10(B). None of these descriptors apply to the fragranced oils that fill the subject diffuser bottles. Interestingly, Customs did not reference ENs 70.10(B) in its analysis, but did consider ENs 70.10(A), which describes bottles used for the conveyance or packing of oils. The bottles envisioned by ENs 70.10(A) are made of colored or colorless glass and are generally designed for some type of closure, which may take the form of ordinary stoppers, which describe the subject merchandise.

Customs also reasoned that, based on its characteristics, the subject merchandise was similar to other diffuser bottles that were previously classified under heading 7013. See Ruling Letter at 5 (citing HQ 960162 (Oct. 17, 1997), HQ 956470

(Sept. 28, 1994), HQ 961409 (Oct. 22, 1998) (collectively the "Rulings")).  The problem

with this part of Customs' analysis is that none of the glass articles in the Rulings are

bottle diffusers, and all are significantly different in physical form from the subject

merchandise.   These physical differences played a major role in determining that,

except in one instance, the glass containers and not their contents were emphasized to

customers.   Here, however, the Ruling Letter speaks in generalizations that do not

easily allow the court to understand the similarities between the characteristics, and in

particular the physical form, of the subject merchandise as compared to the glass

containers of the Rulings.  Accordingly, HQ Q097637 is not so thorough or logical to

warrant deference.

## IV. Conclusion

Based on a consideration of the Carborundum factors, particularly the

merchandise's physical characteristics and the expectations of the ultimate purchaser,

and the court's examination of the subject merchandise, the court finds that the subject

diffuser bottles are of a class or kind of commercially fungible goods principally used as

glass containers to convey fragranced oils, rather than as glassware for indoor

decoration.  Accordingly, the diffuser bottles are classifiable under HTSUS subheading

7010.90.50.  The court will therefore enter judgment for Plaintiff.


                                                            /s/ Leo M. Gordon
                                                         Judge Leo M. Gordon


Dated:   July 17, 2013
         New York, New York